## Chesapeake & O. Ry. Co. v. Conley's Adm'x.

(Decided Dec. 13, 1935.)

670

.LeWRIGHT BROWNING and COMBS & COMBS for appellant.

C. P. STEPHENS for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The foundation facts of this litigation, as disclosed by the record, are so clearly stated in brief of appellant's counsel (it being the defendant below), that we take this excerpt therefrom: "Connecting with appellant's Elkhorn & Beaver Valley Branch at Garrett, in Floyd County, is a spur track extending up Stone Coal Creek, and known as the Stone Coal Spur. It is about one-half mile in length and is operated solely for the purpose of serving some coal mines located along the spur. Cars are taken in and out of this spur track by the engines of freight operated up and down the Elkhorn & Beaver Valley Branch, i. e., when the train reaches Garrett, the engine is uncoupled and run up this spur track either for the purpose of taking empty cars to the mines or removing loaded cars at the mines. If the latter case, the engine is backed up to the head of the spur where it couples on to the loaded cars, and then returns to Garrett, where the cars are switched onto the train that has been left standing. At about 9 o'clock on the night of October 7th, 1933, appellee's intestate, Curtis Conley, a young man 24 years of age, was discovered lying upon the railway, near what is referred to in the evidence as Slater's store, some three hundred yards below the head or terminus of Stone Coal Spur, and a short distance above decedent's home. An engine had backed up the spur track some few minutes before, and while there was no eye-witness to the accident, the decedent was obviously run over by this engine, receiving injuries that shortly afterwards resulted in his death."

Decedent's occupation was that of a miner, and he worked in some of the surrounding coal mines. He was unmarried and resided with his mother, who qualified as administratrix of his estate after his death. As such representative, she filed this action in the Floyd circuit court against defendant, in which she sought judgment against it in the sum of $3,000 upon the ground that it had negligently produced her son's death. The alleged negligence charged in the petition as amended was that the track at the point where decedent was injured was located in a somewhat thickly settled

community (but not a town or village), and that many persons used it as a pedestrian passway throughout the day, including the hour at which decedent was injured, and that defendant's servants in operating the particular train thereon did so "in a careless, reckless, negligent and wanton manner, and that such negligence was the direct and proximate cause of the injury and death of Curtis Conley." The alleged "careless, negligent, reckless and wanton manner" of operation so charged was expressly averred to consist only in a failure to keep "a proper look-out and giving the proper signals of its (train's) approach," to the decedent, who, it was further averred, was walking on the track approaching the train that allegedly inflicted the injuries to him, and from the results of which he died. The answer of defendant consisted of two paragraphs, the first of which was a denial of the material averments of the petition, and the second charged contributory negligence of the decedent, and but for which he would not have been injured or killed. The trial resulted in a verdict in favor of plaintiff for the sum of $2,000, upon which judgment was rendered. Defendant's motion for a new trial having been overruled, it prosecutes this appeal.

Many grounds were relied on in the motion for a new trial, but counsel for defendant in their brief filed in this court abandon all of them except (1) error in overruling their motion for a directed verdict for defendant; (2) the verdict is flagrantly against the evidence; and (3) improper admission of testimony offered by plaintiff over defendant's objections, each of which will be considered and determined in the order named.

The testimony shows that at about the same hour each day a freight train arriving at Garrett from other points of the railroad from whence the spur track ran would stop at that station and uncouple the engine and tender from the rest of the train and then go to the upper end of the spur to take out loaded coal cars from a coal mine located at that point, the rest of the train standing on the proper track while that operation was being performed. Upon the return with the coal cars, they would be put into the train to be carried to their destination. Across the back end of the tender was a broad wooden step or platform suspended entirely across by firmly attached metal spurs or hooks. There was also a headlight on that end, which by far the greater number of the witnesses testified was lighted on

the involved occasion. However, a few witnesses testified that it was not lighted; but no one denied that the headlight on the front end of the engine was burning. The testimony as to the ringing of the bell was in practically the same condition, and as is usual in such cases, some of the witnesses testified to facts that no one corroborated—an illustration of which was that one of them said that he was traveling on a road crossing the spur track some short distance from the point where the accident occurred and stopped his vehicle for the engine and tender to pass and he saw a man with a lantern standing on top of the tender—which fact every other witness in the case refuted.

Some distance beyond that road, and not far from plaintiff's residence, is the point where decedent's body was found in its lacerated condition. He did not die for some time thereafter, and when he was first found he made a statement that "The train hit me." That time was, according to the testimony, anywhere from fifteen to thirty minutes after the train had backed up the spur, and was but a moment or so before it returned with its loaded cars of coal that it went after. A witness for plaintiff (and which is the only one that makes out a semblance of a case) named Ellen Sinkers, testified that she lived some distance above and beyond the point where the accident occurred; that her residence was located close to the spur track; that along in the night somewhere between 8:30 and 9 o'clock (the exact time not being fixed by her), and after she had retired, she was awakened by a knock on her door, to which she responded, and the person was the decedent, who asked her for a drink of water which she furnished him, and that "he drank the water and went on down the creek, and I stood there until I thought he had gotten away from the house * * * and while I was out there the shifter (the train) came up the track and stopped in front of my door, and it did not have any light at all on." She later testified that there was a light on the front of the engine, and that when decedent left her house and started towards the upcoming train he was on the railroad track, but she expressly stated that she did not know whether he later got off the track before being injured, nor did she witness the accident, or profess to state how it happened.

She was the only witness who testified that the train stopped in front of her house on its upgoing trip.

On the contrary, every witness who testified for both sides (and there were many) contradicted that statement. It is and was the theory of plaintiff that decedent started down the spur track from the home of that witness and continued to walk thereon towards the oncoming engine and tender until he was injured by the collision, and that defendant's agents and servants in charge of its locomotive and tender failed to keep a lookout for persons on the track at that place, where, under the established rule in this jurisdiction, such a lookout is required, and that by reason thereof decedent's presence on the track was not discovered in time to prevent the infliction of the fatal injuries. That theory, as we have stated it, is rested entirely and exclusively upon the testimony of the witness, Ellen Sinkers.

On the other hand, all of the servants of defendant who were riding in the cab of the locomotive and a number of others testified, not only that the headlight was burning at the rear of the tender, but also that a lookout was maintained, and that the presence of decedent on the track was not discovered; nor did any of them know of the accident until the train was making the return trip, just a short while before which the mangled body of the decedent was found and some few people had gathered at the spot, and they first informed the servants of defendant that the accident had happened.

A witness for defendant testified that he and decedent got together that afternoon some two hours or more before decedent's body was found on the track; that they were in and out of various places of business and in and about over the town of Garrett where the train stopped to uncouple and make the spur track trip, and that during the time they consumed more or less beer, and, perhaps, some liquor. Others testified to seeing the two together during that period and that the decedent, especially, was considerably intoxicated. At any rate, that same witness testified that at or about the time the uncoupled engine and tender started up the spur track he and decedent took a seat on the platform step at the rear end of the tender, to which we have herein referred, and after they had traveled some distance (and while the train was traveling at a speed of about ten miles per hour, which was that given by all of the witnesses) they concluded to get off, and that he

succeeded in doing so from the side upon which he was sitting; that he did not see decedent land upon the ground from the end of the platform on which he was sitting, and that since he did not find him after the train had passed he concluded that decedent had changed his mind and concluded to remain until he reached a further point than he had first concluded to go; that some short while thereafter he learned of the mangled condition of decedent not far beyond the point where witness alighted from the platform, as indicated. Manifestly, if decedent met his death in that manner there would be no liability on the part of defendant and no such contention is made either in pleading or brief, nor was any such phase of the case dealt with by the court in its instructions; and which leaves for determination defendant's liability as rested upon the testimony of the witness, Sinkers, whose character for truth and veracity was impeached, to say nothing of the incredible nature of her testimony in the light of all of the other facts overwhelmingly established.

Defendant, however, insists that the court should have sustained its motion for a peremptory instruction, notwithstanding the testimony of Mrs. Sinkers as given by her. It should be noted that she did not state that decedent was walking upon the defendant's spur track before knocking at her door, nor when he left her house, although in answer to extremely leading questions she did say that he got upon the track after he left her home, but how long and for what distance he remained thereon was nowhere stated by her. The train was traveling in a hollow made by a small creek and it made considerable noise, as well as reflecting considerable light on either side from the headlight of the engine. Every witness who testified in the case, and who were located in different directions from the scene of the accident, knew of and heard the approach of the on coming train, and decedent was bound to have been aware of it, since there is no intimation that he was either impaired in his sight or hearing. It would, therefore, seem that the only office that a light at the rear of the tender could perform in averting the tragedy would be that it possibly would enable those in charge of the train to see further ahead than might be possible if the light was not burning.

Under such state of the testimony, defendant's counsel contend (a) that their offered peremptory in-

struction should have been given under the rule adopted and applied in many cases from this court to the effect· that where there were no eye-witnesses to the accident, and it with equal plausibility may have happened in different ways and the injuries produced by distinct states of fact, for some of which defendant would be liable and for others of which it would not, then the case should, not be submitted to the jury;.and (b) that it was entitled to the peremptory instruction under the doctrine approved and applied in the cases of O'Dell's Adm'r v. Louisville & N. R. Co., 200 Ky. 745, 255 S. W. 550; Louisville & N. R. Co. v. Sizemore's Adm'r, 221 Ky. 701, 299 S. W. 573, and Chesapeake & O. R. Co. v. Davis' Adm'r, 230 Ky. 268, 18 S. W. (2d) 1108. Domestic cases supporting contention (a) are, Chesapeake & O. R. Co. v. Justice's Adm'r, 253 Ky. 600, 69 S. W. (2d) 1024; Goodman's Adm'x v. Chesapeake & O. R. Co., 252 Ky. 366, 67 S. W. (2d) 469; Wiley's Adm'r v. Chesapeake & O. R. Co., 232 Ky. 15, 22 S. W. (2d) 263; Cochran's Adm'rs v. Chesapeake & O. R. Co., 232 Ky. 107, 22 S. W. (2d) 452; Chesapeake & O. R. Co. v. Goodman's Adm'x, 218 Ky. 117, 290 S. W. 1054; Gregory's Adm'x v. Director General, 195 Ky. 289, 242 S. W. 373, and a long list of others that could be cited.

The holding of those cases, in substance, is, that although defendant may have been guilty of some act of negligence, yet it was incumbent upon plaintiff to prove in some substantial form that such negligence was the proximate cause of the injury, since it is not enough to manifest only a bare speculation that it might have been the cause. Illustrating from the facts· of this case, it is as plausible, so far as the testimony proves that decedent herein stepped immediately in front of the approaching train and was thereby injured, as that he continued to remain upon defendant's track after he left the Sinker residence, conceding that he did so according to that witness. Likewise, he may have stepped from the track, but did not station himself far enough away to avoid the collision, or he may have stopped in order to meet the train and to board it, and in his efforts to do so met his tragic fate. It would, therefore, seem that contention (a) is available to defendant in this case, and that the court erred in not sustaining it.

Contention (b) appears to be well, founded under

the rule established by the opinions in the cited cases, supra, supporting it. In each of them the injured person was approaching the oncoming train, which was plain to be both seen and heard, and we held that under such facts he was so clearly guilty of contributory negligence as to preclude the right of recovery. However, in the Davis Case it was said that the defensive effect of even such gross negligence on the part of the injured one might be circumvented, annulled, or avoided under the "last clear chance" doctrine, if the operators of the train saw, or could by the exercise of ordinary care have seen the victim's peril in time to have prevented it. It therefore is insisted by counsel for plaintiff that the qualification stated in the Davis opinion applies to the facts of this one, and which they argue has the effect to deprive defendant of the benefit of the rule laid down in the O'Dell, Sizemore, and Davis Cases. That contention raises this question—whether or not a defendant who is charged with negligence producing injury and damages for which recovery is sought is required to exercise the proper care to maintain equipment so as to enable him to act under the last clear chance doctrine when it arises? That question is brought into this case by the insistence that defendant maintained no headlight at the rear of the tender of the train while it was backing up the spur track from Garrett to its described destination, and which negligence is, of course, the failure to have its train equipped with prescribed and proper maintenance operating facilities as is required for many other purposes.

That question was before us in the recent case of Braden's Adm'x v. Liston (an automobile case), 258 Ky. 44, 79 S. W. (2d) 241. The whole court considered it. The accident therein occurred upon a public street in the city of Louisville, and perhaps would not have happened had defendant's truck been equipped with the character of brakes required by section 2739g-26 of our present statute. But our opinion, after referring to and discussing many others from this and other courts, as well as text-writers, adopted their conclusions and held that the one charged with failing to exercise his duty, under the doctrine of the last clear chance, was required to only use the means that he then had at hand to prevent injuring one who had negligently placed himself in a perilous situation, and that the law did not exact of him the exercise of ordinary care to main-

tain proper equipment for the protection of one under the last clear chance doctrine, who, through his own negligence, had created his perilous situation. See, also, Louisville & N. R. Co. v. Marlow, 169 Ky. 140, 183 S. W. 470. If that be true in a case where the injured person was at a place where he had a right to be, a fortiori, would it be more applicable when the injured person was at a place where he had no right to be.

A pedestrian so using a railroad track, as decedent in this case was supposed to be doing at the time he was injured, is, technically speaking, neither an invitee nor a licensee (see Marlow Case supra, and a long list of others cited under title "Railroads" volume 16, West Kentucky Digest, 356), both of which acquire some sort of rights in and to the safety of the premises upon which he was injured, as well as the right to rely upon careful operation of the inflicting agency. The ground, supra, of recovery upon which this action is based, is rested upon entirely different considerations. It is limited in its application to specified conditions prevailing in the territory where the accident happened. When first adopted and applied, it went no further than to require the operator of a train, under the specified conditions and within such requisite territories, to maintain a lookout to discover the presence of persons on the track who were neither licensees or invitees, but who were trespassers ab initio, and to exercise ordinary care to prevent injuring them, after their presence upon the track was discovered. That duty arose from the fact that the long-continued use of the track by pedestrians with the knowledge and acquiescence of the operator of the railroad created a duty on its part to take such precautions, and which duty sprang solely from humanitarian considerations and not from any acquired right that a licensee or an invitee possesses. The status of such trespassing pedestrians, as distinguished from an invitee or licensee, is emphasized when it is remembered that no court has ever imposed a duty upon a railroad company to maintain its track bed in a reasonably safe condition for the use of those who might use it as a walkway, but which would follow and be true if the pedestrian occupied the same status as does a licensee or an invitee. See cited cases, supra.

The principle, when involving the last clear chance

doctrine, is exclusively discussed in a lengthy annotation to the case of Smith v. Gould, 110 W. Va. 579, 159 S. E. 53 as reported in 92 A. L. R. 28, the annotation beginning on page 47 of the last publication. The subject of the annotator is divided into four parts: (1) Where the danger is actually discovered by the defendant and the injured person is physically unable to escape his perils; (2) where the danger is actually discovered by the defendant and the injured person is physically able to escape; (3) where the danger is not actually discovered by the defendant but ought to have been, and the injured person is physically unable to escape, and (4) where the danger was not actually discovered by the defendant but ought to have been, and the injured person is physically able to escape. If it were certainly proven that the decedent in this case continued upon the defendant's track until the collision, and it thereby became certainly known as to how and in what manner he was injured, then this case would necessarily fall under the fourth subdivision of the annotator, the discussion of which begins on page 128 of 92 A. L. R. Cases from a great number of states are cited and discussed, and the conclusion reached that liability would not attach under such circumstances. Compare also the text in Chapin on Torts, beginning on page 543, wherein the author discusses the "last clear chance" doctrine, and concludes, after citing many cases, with the annotator in 92 A. L. R. The doctrine seems to have been first promulgated in the English case of Davies v. Mann, M. & W. 546, which is discussed in a most able article in volume 3 Harvard Law Review, beginning on page 263, and in which the writer concurs in the conclusions advanced in the annotation supra, and in the text from Chapin on Torts. For the sake of brevity, we will refrain from further elaboration upon those citations, referring the reader to them for details in the discussion.

For the reasons stated, it becomes unnecessary to burden the opinion with a discussion of either of the other two grounds relied on in brief of counsel for a reversal of the judgment, since, having concluded that the court erred in overruling defendant's motion for a peremptory instruction in its favor, those grounds need not be determined.

Wherefore, for the reasons stated, the judgment

is reversed, with directions to sustain the motion for a new trial, and for proceedings consistent with this opinion.