## Chesapeake & O. Ry. Co. et al. v. Bryant's Adm'r.

(Decided Dec. 17, 1937.)

HUNT & BUSH, RUFUS LISLE and JOHN M. THEOBALD for appellants.

R. T. KENNARD and DYSARD & TINSLEY for appellee.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

The appellant, Chesapeake & Ohio Railway Company, operates a line between Louisville and Ashland, Ky. It passes through Carter county, and at the point involved in the accident which gives rise to this action the line of the railroad runs in an eastwardly direction toward the town of Soldier from a point where it comes out of Triplett Tunnel. Between the tunnel and Soldier there is a grade crossing where the county road coming out of the south passes over the railroad right of way toward the Midland Trail, which lies north of the track. The track is straight for a considerable distance after it leaves Triplett Tunnel until within a few hundred feet of the crossing, where it enters upon a curve of 3′ 45″, which continues for some distance beyond the point where it meets the county road. The main line track is on the north, or out, side of the curve, and a passing track is on the south, or in, side of the curve. After leaving Triplett Tunnel and a cut, the tracks are on a fill which continues past the point of the crossing, with the result that there is an abrupt rise in the roadway as one approaches the railroad track from the south. The road declines much more gradually on the north side of the crossing. On the night of July 10, 1935, a fast east-bound passenger train (known as the Fast Flying Virginian) passed the county road crossing at a speed variously estimated from 40 to 60 miles an hour, on time, at 10:21 or 10:22 p. m. As the pilot on the engine reached a point 10 or 15 feet beyond the crossing, the fireman says that he saw an object coming out from under the cylinder on the left, or north, side

of the engine, which had apparently been struck by the locomotive and was thrown to the north, away from the track. The fireman thought that it was a calf which had been struck, and so advised the engineer. The engineer saw nothing, although he says that he was maintaining a lookout, and the curve of the track would facilitate his view of the crossing.

Appellee's decedent, Emerald D. Bryant, was a young man of about 20 years, 6 feet tall, weighing 180 pounds, and in excellent health. He was employed by his brother in doing odd jobs and in running a truck. On the night in question, Emerald went to a revival meeting with Miss Eva Brown. After the services were over, he and Miss Eva strolled to the home of W. A. Gilbert, where she lived. This was approximately 100 yards southeast of the grade crossing on the county road to Soldier. The couple lingered at the gate for some minutes, when Miss Eva says that she heard the train whistle for the station of Haldeman lying west of Triplett Tunnel. She says that this called her attention to the lateness of the hour, and that she remarked to the decedent that "there was the whistle and I thought I should go in." On cross-examination she testified:

"Q. 8. Was there anything said between you and this young man about the train at that time? A. Well, yes sir.

"Q. 9. Tell the jury what was said between you and him about the train coming? A. Well, I had promised Mom that day—she asked me to go in early—when I heard the train whistle I told him there was the whistle and I thought I should go in.

"Q. 10. Then he knew at that time that train 24 was coming? A. He knew it was coming; yes sir.

"Q. 11. Knowed the train was coming and he left you and started in the direction of his own home? A. Yes sir."

Miss Eva went into the house, and decedent thereupon proceeded up the county road toward appellee's home, which was north of the crossing.

Some five or ten minutes after the train had passed the crossing, three young men who happened to be

walking together in the vicinity heard groans, and upon investigation found the decedent in a terribly mangled condition at a point some 40 or 50 feet east of the crossing, and from 15 to 25 feet north of it. One of his shoes and a sock were off and were found near his body. There was a cut on the instep of the shoeless foot but no corresponding cut on the shoe. He died within less than an hour after he was discovered. There was some evidence of marks on the crossing, which might have been made from decedent's shoes, and stains, which were thought to be blood, marked the evident flight of his body. After the train reached Ashland, an examination of the locomotive disclosed some hairs, thought to be human hairs, on the step of the pilot.

On the trial of the action the jury returned a verdict of $12,000 against the appellants, and this appeal followed. It is argued: (1) That the trial court should have sustained appellants' motion for a peremptory instruction; (2) that the verdict is speculative or conjectural and is flagrantly against the evidence; (3) that the court erred in the admission of certain testimony; and (4) that the instructions were erroneous.

It is elementary that the evidence introduced must not only tend to show negligence on the part of the defendant, but that such negligence must likewise appear to be the proximate cause of the resulting injury. Similarly, the injured party must himself be free of contributory negligence. In the case at bar, it is certain that the decedent knew of the approach of the train before he went upon the crossing. His conversation with Miss Eva demonstrates this fact. While several witnesses testified that they did not hear the train whistle, a number of them say they heard it, and all of them heard the noise of the train. Some of these witnesses were in the open, and others were at home in bed. Several of them were a considerable distance from the crossing. The decedent, in full possession of his faculties, was in a better position to hear than any of these other persons, and, in addition, must have seen the headlight on the engine if he looked at all. As said in Chesapeake & Ohio Railway Company v. Conley's Adm'x, 261 Ky. 669, 88 S. W. (2d) 683, 685:

"Every witness who testified in the case, and who were located in different directions from the scene

of the accident, knew of and heard the approach of the oncoming train, and decedent was bound to have been aware of it, since there is no intimation that he was either impaired in his sight or hearing.''

Appellee seeks to avoid the force of these inexorable facts by reliance upon a line of cases, of which the following quotation from Kilpatrick v. Grand Trunk Railway Company, 74 Vt. 288, 52 A. 531, 536, 93 Am. St. Rep. 887, furnishes a fair example:

''The prudent man is not the man who never forgets anything, who is never guilty of any inattention, who never fails to think of any possible danger to which he is exposed. That is the perfect, the infallible man. Circumstances may excuse ignorance, forgetfulness, inattention, whenever the jury may reasonably say that a man so placed might be so ignorant, or forgetful, or inattentive, without losing his right to be called a prudent man in the circumstances.''

The difficulty with the application of this and similar cases to the case at bar lies in the fact that there is no circumstance shown in the evidence from which the jury might legitimately infer an excuse for the plaintiff's failure to exercise the standard of care which the law requires of him for his own protection, nor from which it might be inferred that a prudent man might ordinarily be forgetful under these circumstances. If we should follow this theory, it might with equal force be argued that the temporary mental aberration of the engineer in his alleged failure to sound the whistle, as required by statute, was the mere human frailty of a prudent man, and not negligence. Any legal standard of care must, in theory at least, apply to all men alike under similar circumstances. The idea is ably expressed by Holmes in his work, ''The Common Law,'' p. 110:

''It is not intended that the public force should fall upon an individual accidentally, or at the whim of any body of men. The standard, that is, must be fixed. In practice, no doubt, one man may have to pay and another may escape, according to the different feelings of different juries. But this merely shows that the law does not perfectly accomplish its ends. The theory or intention of the law

is not that the feeling of approbation or blame which a particular twelve may entertain should be the criterion. They are supposed to leave their idiosyncrasies on one side, and to represent the feeling of the community. The ideal average prudent man, whose equivalent the, jury is taken to be in many cases, and whose culpability or innocence is the supposed test, is a constant, and his conduct under given circumstances is theoretically always the same.

"Finally, any legal standard must, in theory, be capable of being known. When a man has to pay damages, he is supposed to have broken the law, and he is further supposed to have known what the law was."

The situation may call for the intervention of a jury to determine whether the defendant's conduct falls on the one or the other side of the line, but not to fix the standard. The standard is a matter of law, not of fact. If the presence or absence of a duty to the plaintiff were left to the judgment of a jury, no defendant could be held to know in advance the duties required of him.

Holmes points out that the law has not only fixed general standards, but, where the courts have felt themselves on safe ground, specific standards for particular circumstances. He continues:

"If, now, the ordinary liabilities in tort arise from the failure to comply with fixed and uniform standards of external conduct, which every man is presumed and required to know, it is obvious that it ought to be possible, sooner or later, to formulate these standards at least to some extent, and that to do so must at last be the business of the court. It is equally clear that the featureless generality, that the defendant was bound to use such care as a prudent man would do under the circumstances, ought to be continually giving place to the specific one, that he was bound to use this or that precaution under these or those circumstances. The standard which the defendant was bound to come up to was a standard of specific acts or omissions, with reference to the specific circumstances in which he found himself. If in the whole depart-

ment of unintentional wrongs the courts arrived at no further utterance than the question of negligence, and left every case, without rudder or compass, to the jury, they would simply confess their inability to state a very large part of the law which they required the defendant to know, and would assert, by implication, that nothing could be learned by experience. But neither courts nor legislatures have ever stopped at that point.

"From the time of Alfred to the present day, statutes and decisions have busied themselves with defining the precautions to be taken in certain familiar cases; that is, with substituting for the vague test of the care exercised by a prudent man, a precise one of specific acts or omissions. The fundamental thought is still the same, that the way prescribed is that in which prudent men are in the habit of acting, or else is one laid down for cases where prudent men might otherwise be in doubt."

It is clear that the same philosophical consideration of the standard of care to be exacted of a defendant applies with equal force to the consideration of the plaintiff's contributory negligence. What are we to say of the care exercised for his own safety by one who, with full knowledge of the approach of a train, walks or stands or sits upon the tracks with apparently no concern whatever for his own safety? In Myers v. Cassity, 209 Ky. 315, 272 S. W. 718, it was held that one who saw an automobile 300 yards away and again when only 100 yards away, and thereafter attempted to cross a road in the path of the automobile without looking to see where it was, was guilty of contributory negligence as a matter of law. A similar conclusion was reached in Cumberland Grocery Company v. Hewlett, 231 Ky. 702, 22 S. W. (2d) 97, and in Louisville Railway Company v. Basler, 198 Ky. 500, 248 S. W. 1027. It seems apparent that the "featureless generality" referred to by Mr. Justice Holmes has here given way to a specific standard, and it likewise seems clear that one who walks across a railroad track with knowledge of a train's approach, and without looking, is guilty of contributory negligence as a matter of law. The cases amply justify this conclusion. For example, see Louisville & Nashville Railroad Company v. Molloy's Adm'x,

346

122 Ky. 219, 91 S. W. 685, 28 Ky. Law Rep. 1113; Louisville & Nashville Railroad Company v. Trower's Adm'r, 131 Ky. 589, 115, S. W. 719, 20 L. R. A., N. S., 380; Cox's Adm'r v. Cincinnati, N. O. & T. P. R. Co., 238 Ky. 312, 37 S. W. (2d) 859.

It is urged that this case is distinguishable from those cited because, in the lapse of time during which decedent walked from the Gilbert home to the tracks, he may have forgotten about the train. This could not change the principle involved. In those cases, as in this, the absentmindedness of the injured person was the very basis of his negligence. The knowledge of the approach of the train raised the obligation to look for it, and it was negligence not to take some precautions. As those cases demonstrate, a person may be forgetful in a much shorter time than the decedent here, but they have nevertheless been held guilty of negligence. Aside from this, as said in Chesapeake & Ohio Railway Company v. Conley's Adm'x, supra, "decedent was bound to have been aware of" the approaching train.

The evidence, while purely circumstantial, strongly indicates that the decedent was either stooping over or else sitting on the tracks, removing his shoe, at the time when the accident occurred. It is unnecessary that we should examine this proof in view of our conclusion that the contributory negligence of deceased was established as a matter of law. All other questions than the one here specifically decided are reserved.

Judgment reversed.

Whole court sitting.