## New St. L. & Calhoun Packet Corporation v. Pennsylvania R. Co.

March 12, 1946.

694

Judge Thomas dissenting.

Henry D. Hopson and Woodward, Dawson, Hobson & Fulton for appellant.

Bullitt & Middleton for appellee.

OPINION OF THE COURT BY MORRIS, COMMISSIONER— Reversing.

At the time of the alleged injuries, appellant, plaintiff below, was engaged in the excursion business on the Ohio River. Appellee owned a railroad bridge across

the river. Plaintiff charged that on June 1, 1942, its boat was lying below the drawbridge. Plaintiff had contracted with various organizations for excursions on the Ohio above the bridge for dates June 1 to 6, inclusive.

It is charged that defendants negligently suffered its drawbridge to become and remain out of repair on and after June 1, to such an extent that it was unable to afford passage of the steamer up the river; that on June 1 plaintiff notified defendant of the facts above stated, and advised that it would suffer great damage unless defendant promptly arranged to operate its span so as to afford passage up the river, and requested defendant to advise as soon as possible what date the bridge would be repaired, in order that it might advertise for trips when its boat would be enabled to resume service. In response to this request an employee wrote: "I acknowledge receipt of your letter of June 2, which I am referring to our superintendent that he may advise you as soon as possible. C. J. Todd, Freight Agent."

It was alleged that following this communication no further notice was given to plaintiff "until after the bridge was open for traffic on Saturday, June 6, at about 2:50 a. m., and since it takes several days to advertise and collect passengers, plaintiff was unable to resume trade before June 10." It is alleged that as a result of defendant's acts plaintiff lost the use of its steamer for 10 days, and was damaged in the sum of $8,880.13. Answer was a denial, without affirmative plea.

The trial came on and at the close of evidence the court sustained defendant's motion for peremptory. While several grounds were advanced in support of motion for new trial appellant's brief narrows its grounds for reversal to alleged errors of the court in (1) admitting incompetent evidence offered by appellee; (2) giving peremptory instruction for defendant, because (a) testimony adduced by appellant was sufficient to make the question of negligence one for the jury, and (b) appellant's admitted failure to notify appellee of fact that the bridge had been opened caused additional loss of use, for which plaintiff was entitled to recover. Finally, that the doctrine of res ipsa loquitur applies, making the question of negligence one for the jury.

In order to reach a discussion of the points raised it becomes essential to give a description of the drawspan and the parts which enter into its operation. It is shown that the drawspan weighs around 800 tons; that when the span is raised its weight is counterbalanced by weights at the ends of the span weighing the same. Steel cables run over four sheave wheels each keyed to a steel axle about 21 inches in diameter, supported by bronze bearings weighing 200 pounds, bolted into a framework by four large bolts in front and on the lower side of the framework, and on each side of the sheave wheel. When the span is raised to its limit, or lowered, the wheel, and consequently the axle, turn slowly, making three-fourths of a complete revolution. Each bearing has a metal cover plate placed there, as said, to keep out foreign substance or water. The bearings are lubricated by means of two oil boxes on top of the cover caps, and two grease cups on one side with pipes leading to the lower side of the bearing; lubrication is had by pouring oil into the boxes on top, and forcing grease from the caps through pipes into the bearing surface. The span is raised and lowered by an operator located on a part of the span.

Appellee only introduced one witness, Mr. Meyer, an officer of the packet company, who went into detail as to the operation and lack of ability to operate his steamer up the river, and the extent of monetary damage suffered by inability to operate above the bridge. It is not necessary for us to go into detail since the determination of the controversial questions does not involve the elements or extent of damage, except in one particular, and that is the claim of damage because of the alleged failure of defendant to notify plaintiff of the time when the drawspan would be or was repaired.

As we read the testimony of Mr. Meyer we find that he had knowledge of the operation of the drawspan about 3 a. m., June 6. His claim was that his operation overhead was to the same extent as if he had been operating regular scheduled trips, but his expense was more "due to advertising trying to get people there on short notice." In brief appellant mildly insists that aside from the agreement of appellee it was its duty to notify appellant when the bridge was in operation. We are not pointed to any law which so required, and there is no allegation of duty. If the letter could be construed

as a contract, it only went to the extent of an agreement to "advise as soon as possible." It is noted that appellant abandoned all theory of damage on this score, since it tendered two instructions both of which limited liability of the defendant for its negligence in failing to keep the bridge open "from the period of June 1 to June 6, 1942, inclusive." The peremptory was undoubtedly correct to this extent.

There is no controversy between the parties as to the application of the doctrine of res ipsa loquitur; that is, that plaintiff's proof had established an inference of negligence on the part of the bridge company. Appellee admits it "assumed the burden of going forward with its proof * * *." The case presents a clear cut one in which the doctrine applies. See Riebert v. Thompson, 302 Ky. 688, 194 S. W. 2d 974. The dispute arises over the effect once the doctrine is established.

On the day of the breakage Walter Bottorff, operator of the drawspan for a period of fourteen years, was on duty. At 6:39 a. m. he gave the clearing signal, and raised the span for a boat to pass. The span arose all right, but when lowered, it was "a little bit slow coming down." He treated the slow movement casually, since he said that sometimes low voltage "or dirty contact" caused slow movement. His next operation was at 8:32 a. m., when appellant's boat passed down the river. When he lowered the span its movement was "sluggish, very slow." He said that in his whole experience it had never operated as slowly as at this time. The movement was so unusual that he at once communicated with the "bridge man." He said that he did not know what had happened. He said the average operation of the span was about five times daily throughout the year.

Eggert, the bridge carpenter for many years, said it was part of his duty to inspect the bridge every day, and he had made an inspection on May 31 by "looking everything over; the oil cups, cables and motors," and on that day everything was all right. He learned of the accident around 9 a. m., and with a fellow employee made examination, finding the "top housing torn off the cover of the axle." The bearing was nearly turned out; the four studs on the side broken off, and the studs on top sheared, the axle resting partly on its frame. On cross-examination he said that it was the duty of Poage and

Taylor to do the oiling, but he had to see to the oiling, and sometimes helped them. This witness was asked whether he or others had ever taken the cap or covers off for inspection, and he said it had not been done to his knowledge since 1938. This witness also said that they put the old bearing back. He said he looked into the top oil caps about once a week, and did this on May 31st. He looked at the bearing when he arrived on the scene and "there was plenty of oil in there."

Clarence Leatherman, an employee of the Bethlehem Steel Company, qualified as an expert bridge builder, said he was familiar with the type of bridge under consideration. He came to the scene about 4 o'clock Monday and began an inspection. He found the situation about the same as described by Eggert, and said the bearing was "oily and greasy; the shaft was scarred a little." He had never heard of a similar accident. When asked what caused the trouble he said he could not say, but seemed sure that it was not caused by lack of lubrication. He was asked, "Let us assume they had men to go over it and inspect it every day, and that those bearings were oiled every week, and they had monthly, quarterly and annual inspections, would you know of any other inspection that was possible to discover a condition of that kind to prevent the happening?" He said, "I don't see how they could have." He said the function of the cover cap was to prevent water and dirt from getting into the lubrication. On cross-examination he said the shaft was scarred a little, over about half the length of the shaft from cam to center, or half the turn. He thought this occurred during the lift or lowering of the span.

On re-direct examination he said he thought the bearing was turned out of place on the up move, and in all his experience he had never heard of a case where the axle or shaft had frozen; he did say that the only way to tell whether there is proper lubrication is to remove the tops. One significant statement of this witness was that in making his inspection he took the top off the other axles and bearings and had the span raised and lowered to see whether there was proper lubrication. This, he said "is the only way to tell whether it is being properly lubricated."

Walton, bridge engineer working for defendant since 1911, was familiar with the construction and plans. He

came by plane from Chicago, reaching the scene with others soon after his arrival at 4 p. m. He described the condition practically as had others. He said the bottom bearing was not injured, and the inner surface was covered with grease. He had no idea what caused the bearing to turn out, but was of the opinion that it "happened all at once on the uplift, but the scoring could have happened on the upward or downward movement." On cross-examination he said that "freezing" would occur where two surfaces stick together sufficiently to break the support loose; when it is frozen it turns all at once and something breaks loose. Oiling is done to prevent such friction, but "there was no evidence of lack of lubrication."

Howell, Division master carpenter, Walton and others, testified to about the same effect, and two assistant carpenters testified that they had oiled the shaft and bearing on May 29. It is significant that Howell said that when inspection is made the covers are taken off the top of the shaft, chiefly to inspect the keyways in the axle. This inspection is made twice each year. This was to see that the keyways were tight and holding the axle on the shaft. He does not state when such an inspection was last made. Potts, bridge inspector, whose duty was monthly inspection of every part of the bridge, made his last inspection prior to breakage on May 19. He looked at all parts carefully and saw that they were well lubricated. He was asked if he took the top cover from over the axle; he answered, "We do that frequently, but not to note lubrication." He had taken this cover off at different times, but he could not say when it had been last removed. The removal was particularly to see if the keys were tight on the shaft.

Before we get to the main controversial question we shall take up appellant's contention that certain proof of appellee was incompetent. This relates solely to the showing of lubrication. Eggert was first to arrive at the point after the accident, in company with a Government man; he testified that they saw oil on the bearing. Howell went to the scene shortly after 11:30 and found oil and grease on the shaft and bearing. Walton arrived at 4 p. m., Preston at 9 p. m., and Leatherman at 4 a. m. (perhaps on Tuesday). The contention is that the evidence as to lubrication was incompetent because it was not shown that the condition of the parts

were the same from the time of the accident until the witnesses made their observations.

We take these objections, insofar as the brief divulges, to be to the testimony of Leatherman and others, and not to that of Eggert. Counsel rely on the rule laid down in Appalachian Stave Co. v. Pickard, 260 Ky. 720, 86 S. W. 2d 685, to the effect that where a condition is permanent such as a defect in the road, its existence at the time may be inferred by its subsequent existence, but proof of the subsequent existence of a temporary condition, such as tracks in a dusty road, highly traveled, where considerable time has intervened and there is no showing that the condition has remained the same in the interval, is not evidential. See also Chesapeake & O. Ry. Co. v. Pittman, 292 Ky. 331, 166 S. W. 2d 443. Here a reading of the proof shows that the shaft and bearing were in the same condition as to lubrication and position when the challenged examinations were made, though Eggert and Poage did take off the top housing, which had no relation to lubrication.

It appears from the record that contrary to statements in appellant's brief, Eggert testified that he looked at the bearing to see whether it was greased, and ''there was plenty of oil on there, after it was turned out,'' and on recross-examination Eggert was asked: ''Did you make or see an examination of the top of the bearing where it had been in contact with the shaft? Ans. There was oil all around there, and all around the axle.'' This testimony was more clearly brought out by appellee's counsel. Since the other witnesses who came on the scene later (not too remotely in time) and whose testimony is challenged, testified to all intents and purposes to the same condition as to lubrication, it seems to us that this testimony was competent.

The plaintiff then introduced several witnesses, one Capt. Metcalf, a marine engineer and boiler inspector, and experienced in the workings of shafts and bearings, going into detail as to functions and operation. He said if proper lubrication is not had there will be friction and a resultant gripping or freezing. He was propounded an hypothetical question, which described the mechanics and operation of this particular machinery, and the condition following the accident, and was asked his opinion as to cause of the breakage; he said

"there are two things possible that would cause this bearing to shear off the bolts; one would be lack of lubrication causing the shaft to freeze; the other would be the shaft having been thrown out of alignment by some damage or lifting of the shafting." Then, "Assuming that the shaft was not thrown out of alignment, what was the cause?" He answered, "Either lack of lubrication or the shafting had become rough due to dirt or other foreign matter having got into the bearing." His examination of photographs led him to the opinion that the scoring was caused by the presence of foreign substance. He testified that the only way to tell the actual condition of a slow turning shaft, or its bearing, would be by periodic removal of cover caps; he was of the opinion that inspection should have been monthly or probably oftener.

Capt. Phillips of the Steamer Idlewild, chief engineer for 20 years or more, familiar with large shafts and bearings on steamboats, merely showed that if foreign substance got into bearings freezing would result and tear out the bolts. His engineer removes caps every week for inspection. Fred Koehler, steamboat engineer, said lack of lubrication or foreign particles in shaft would cause a cutting and freezing of the bearings. His plan was to remove the housing to see if oil reached all spots. Other witnesses tracked this testimony. Walton recalled by defendant said on cross-examination, that inspection for lubrication could be made by removing covering and raising and lowering the bridge.

Counsel for appellant contends that this rebuttal evidence was not sufficient to take the case to the jury. It is not contended that it was incompetent, but that it had no relevancy because these witnesses had experience only on river boats; had never seen the mechanism in question, and only theorized that the stoppage occurred because of lack of lubrication or presence of foreign substance, but they also expressed the opinion that there was lack of proper inspection, which may bear on the question of whether or not there had been exercised due care. These witnesses were experts in their line, but appellee contends they are not qualified to testify as to this particular mechanism and that the defendant's evidence had conclusively shown that the accident was not due to faulty lubrication or the presence of foreign substance. While it may be that the preponderance of

evidence showed proper lubrication, it was not shown that the presence of some foreign substance or some misplaced part did not cause the accident. A comparison is made between the speed and constant revolution of the shaft on a steamboat, and the slow partly revolving shaft in question, but these witnesses showed familiarity with large shafts and bearings, the proper method of lubrication and chiefly the method of and necessity for proper inspection, conflicting with appellee's employees and experts on the same question. We think this evidence was sufficient to create a conflict; to present situations and duties, and the carrying out of duties in the exercise of care, upon which the minds of reasonable men might well differ or form diverse beliefs, and was sufficient to carry the case to the jury.

We come now to the last contention, error of the court in withdrawing the case from the jury. The res ipsa doctrine when applicable creates a necessity of "explanation" as the term is used in res ipsa cases, of the cause of the accident, or to show satisfactorily lack of negligence, or as appellee contends, to show the exercise of ordinary care; appellee contends that it fully and completely showed proof that there had been such exercise, hence no negligence, and insists that the court's ruling was correct.

We have a typical case permitting the application of the res ipsa doctrine, which is, when a thing causing the injury is in the exclusive control of the defendant, and the injury is such as in the ordinary course of things does not occur if the one having such control uses proper care, then the injury inferentially arose from the defendant's want of care or by his negligence, and it becomes incumbent on defendant to explain away, clear up and exonerate itself of the imputation or inference of negligence which arose and existed at the moment the injury was shown, without any fault on the part of the plaintiff.

It is unnecessary for us to go into discussion of the numerous cited cases mostly of foreign jurisdictions, some from our own court, which correctly hold that the defendant was only obligated to use ordinary care in the maintenance and inspection of its bridge span, and that where it be conclusively shown that there was exercise of ordinary care the inference of negligence disappears from the case. The foreign cases are fairly well dis-

tinguished in appellant's reply brief. Appellee relies for the principle stated on Dunning v. Kentucky Utilities Co., 270 Ky. 44, 109 S. W. 2d 6, 9, a res ipsa case. The defendant there "went forward" with testimony which we found to have shown the exercise by defendant of "proper care" and thus finding we wrote that if one charged with negligence by proof shows due care, and "thereby completely overcomes the inference to be drawn by the jury from the testimony produced by the plaintiff, then the 'inference' of negligence is wiped out and destroyed, and defendant is entitled to a directed verdict." However, we did not stop at this point. We referred to Black Mountain Corp. v. Partin's Adm'r, 243 Ky. 791, 49 S. W. 2d 1014, 1017, and repeated what was there said: "But, in order for that rule of practice to apply, the *overcoming* proof introduced by the one charged with negligence must be undisputed and uncontradicted by any testimony or circumstances refuting it."

Here the ultimate question is whether or not the defendant overcame the inference 'of negligence by showing what care it had exercised in the maintenance and inspection of its machinery. This was persuasive, but there was conflicting evidence by experts which might tend to persuade a jury that there was neither proper lubrication nor inspection of the parts, such as to show due care; this more so, perhaps, as to the matter of inspection than lubrication, though a jury might under the proof conclude otherwise. One thing seems to stand out and that is, a jury might conclude that an accident of this sort would not have occurred had there been proper lubrication; proper inspection for lubrication or to determine if there were foreign substances present, which it is argued might have caused the breakage. The general rule is that while determination of the degree of care is one for the court (Chesapeake & O. Ry. Co. v. Bryant's Adm'r., 272 Ky. 339, 114 S. W. 2d 89) whether care was exercised in discharge of a duty, is generally a question for the jury. Jones v. Sharp's Adm'r, 282 Ky. 638, 139 S. W. 2d 731.

Upon the whole case we are of the opinion that the court should have passed the case to the jury, except on the question of liability for failure to notify appellant of the repair or opening of the bridge. Judgment reversed with directions to award a new trial.

704

Judge Dawson not sitting.

Judge Thomas dissents, being of the opinion that the proof of defendants was sufficient to overcome the inference of negligence arising under the res ipsa doctrine, hence the trial court correctly directed peremptory instruction.