944 F.2d 904
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
James BYLER, Individually and as Administrator of the Estate
of Samuel Lee Byler, a minor, Valerie Byler, Individually,
Harold Aleshire, Executor of the Estate of Lula Tomblin and
Administrator of the Estate of Janet Sue Byler, Linda Lou
Jupin, Co-Administrator of the Estate of Roy Jupin, Jeff
Jupin, Co-Administrator of the Estate of Roy Jupin, Hurst
Home Insurance Company, Humana Health Plans, Inc., Hurst
Home Insurance Company, and Humana Health Plans, Inc.,
Plaintiffs-Appellants,
v.
SCRIPTO-TOKAI CORPORATION, Defendant-Appellee.
 Nos. 90-6112, 90-6113.
 United States Court of Appeals, Sixth Circuit.
 Sept. 17, 1991.
 
 On Appeal from the United States District Court for the Western District of Kentucky, No. 89-00016; Johnstone, J.
 W.D.Ky.
 AFFIRMED.
 Before BOGGS, Circuit Judge, KRUPANSKY, Senior Circuit Judge,* and DUGGAN, District Judge.**
 PER CURIAM.
 
 
 1
 Plaintiffs appeal from the grant of summary judgment for defendant in their product liability suit. This suit has three claims: strict liability, negligence, and breach of implied warranty. Appellants claim that the district court erred in ruling that Scripto-Tokai did not have a duty under Kentucky law to insure that its disposable butane lighters were childproof or child resistant. For the reasons that follow, we affirm the district court.
 
 
 2
 * This suit arose out of a fatal fire at Lula Tomblin's home in Brandenburg, Kentucky on January 9, 1988. Four persons died in that blaze: Mrs. Tomblin; one of her adult daughters, Janet Sue Byler ("Janet Sue"); an adult friend, Roy Jupin; and Janet Sue's three-year old grandson, Sammy Lee Byler ("Sammy Lee"). Sammy Lee's parents lived in northern Ohio, but Sammy Lee had been staying with his grandmother since Thanksgiving. Patricia Hatfield, Mrs. Tomblin's other adult daughter, survived the blaze.
 
 
 3
 Hatfield and the deceased had been at home all afternoon. The adults, except for Mrs. Tomblin, had been drinking and smoking all afternoon. Those adults who had been drinking had all had at least three or four mixed drinks. The bodies of Jupin and Janet Sue Byler were discovered to possess blood alcohol levels of .19 and .20, respectively. Sammy Lee Byler's body was also tested and found to possess a blood alcohol level of .05. Hatfield refused to be tested for blood alcohol content.
 
 
 4
 The blaze began around 4:30 p.m. Janet Sue left the card table around which the adults had congregated for hours and went to a bathroom, taking Sammy Lee with her. A few minutes later, Hatfield joined Janet Sue. Sammy Lee then left the bathroom. Hatfield smelled smoke a little later and left the bathroom, entering an adjoining bedroom. She saw Sammy Lee standing at the foot of the bed with a disposable butane lighter in his hand. The lighter was not lit. The bed clothes at the foot of the bed were aflame, but the fire had not yet reached the middle of the bed coverings or the bed itself. Jupin was standing in the bedroom between the door and the bed.
 
 
 5
 Hatfield tried to take the lighter away from Sammy Lee, but he threw it through the doorway connecting the bedroom and the hall and scampered off. Hatfield left the house to fetch a garden hose and put out the fire. She told Jupin and Janet Sue to try to extinguish the fire while she went to hook up the garden hose. Hatfield states in her deposition that she took about two minutes to fetch and attempt to hook up the garden hose, but by that time the entire house was ablaze. She tried to re-enter the house, but was unable to. Tomblin, Janet Sue, and Sammy Lee died in the fire. Jupin was extracted by another individual, but died eleven days later at a hospital of a heart attack.
 
 
 6
 The adults regularly used disposable butane lighters of all brands. A bag of ten to twelve Scripto-Tokai lighters had been given to Hatfield for Christmas, and they were hanging within Sammy Lee's reach outside the bedroom where the fire started. No other brands have been positively identified as being present at the time of the fire, but Hatfield stated in her deposition that there were several brands of lighters present at Tomblin's house that day.
 
 
 7
 Hatfield testified that the adults regularly left lighters on tables and around their cigarettes. No effort was made to keep the lighters out of Sammy Lee's reach. Hatfield stated in her deposition that she could recall at least two prior instances of Sammy Lee's playing with the lighters, including once when he was caught under the couch with an ignited lighter searching for a toy. On this and the other occasions, Hatfield or Janet Sue took the lighter away from Sammy Lee. Hatfield stated in her deposition that she was aware that disposable butane lighters should be kept out of the reach of children, and that children could start fires with the lighters.
 
 
 8
 The fire department did not conclusively establish a cause for the fire. Sheriff Joseph Greer stated in his deposition that he was curious about Hatfield's statement that Sammy Lee had thrown a lighter out of the bedroom where the fire had started. He went to the bedroom's remains after the fire department had cleaned out most of the debris, kneeled on the ground in the approximate location of the bed, looked to where the door used to be, and searched the area where he thought a three-year old could have thrown a disposable butane lighter. He found such a lighter deeply burned into the ground. This lighter was manufactured by Scripto-Tokai.
 
 
 9
 All disposable butane lighters marketed in the United States, including Scripto-Tokai's, contain a warning on the package, "Keep Out of Reach of Children." There were at the time of the blaze no warnings on the lighters themselves.
 
 
 10
 This suit was filed in federal court on the basis of diversity jurisdiction. All parties correctly agree the law of Kentucky controls. Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938). After Scripto-Tokai moved for summary judgment and plaintiffs filed their response, the district court granted Scripto-Tokai's motion. The court held that Kentucky courts would hold that a manufacturer of disposable butane lighters was under no duty to make its lighters child proof, and that the lighters were not unreasonably dangerous. The court held that its ruling that lighter manufacturers are under no duty to make their lighters child proof also disposed of the negligence and breach of warranty claims. Plaintiffs' timely appeals followed.
 
 II
 
 11
 * We turn first to the plaintiffs' strict liability claim. Kentucky has adopted § 402A of the Restatement (Second) of Torts as the foundation for its product liability law. Dealer's Transport Company v. Battery Distributing Company, 402 S.W.2d 441 (Ky.1965). Section 402A imposes liability for personal injuries caused by a manufacturer's product sold in a "defective condition unreasonably dangerous." Kentucky has declared that a design flaw can place a product in a "defective condition." Jones v. Hutchison Manufacturing, Inc., 502 S.W.2d 66 (Ky.1973). Plaintiffs contend in their first claim that Scripto-Tokai's lighters were flawed because the lighters' design permitted young children, such as Sammy Lee, to operate them. Thus, plaintiffs may recover only if that flaw makes those lighters "unreasonably dangerous."
 
 
 12
 Kentucky's law on what makes a product "unreasonably dangerous" is not a model of clarity. The law generally requires a court to permit a jury to determine if a product is "unreasonably dangerous," with the jury weighing a number of factors. Montgomery Elevator Company v. McCullough, 676 S.W.2d 776 (Ky.1984). The factors to be weighed by the jury include the following considerations:
 
 
 13
 [The] feasibility of making a safer product, patency of the danger, warnings and instructions, subsequent maintenance and repair, misuse, and the product's inherently unsafe characteristics, while they have a bearing on the question as to whether the product was manufactured "in a defective condition unreasonably dangerous," are all factors bearing on the principal question rather than separate legal questions. In a particular case, as with any question of substantial factor or intervening cause, they may be decisive.
 
 
 14
 Montgomery Elevator, 676 S.W.2d at 780-81.
 
 
 15
 Kentucky has defined the "principal question" underlying the jury's determination in the negative: A product is not unreasonably dangerous if the manufacturer acted prudently in placing the design into commerce. Nichols v. Union Underwear Company, 602 S.W.2d 429 (Ky.1980).
 
 
 16
 However, a court need not require a jury to consider those factors in cases where a single named element was important enough to absolve a manufacturer from liability as a matter of law. Montgomery Elevator, 676 S.W.2d at 780-81. While Kentucky does not have a rule permitting a future court to identify such a case, it listed in Montgomery Elevator four prior decisions as examples of cases in which one consideration dominated. In Ulrich v. Kasco Abrasives Co., 532 S.W.2d 197 (Ky.1976), the failure of the purchaser to maintain the product properly caused the defect and the injury, not the original design itself. Each of the other three cases listed involved a product with a very obvious danger to users, one so obvious that the manufacturer should not be held liable when the danger was realized. See Sturm, Ruger & Co., Inc. v. Bloyd, 586 S.W.2d 19 (Ky.1979) (manufacturer not liable for accidental discharge of gun when it clearly warned purchasers that safety mechanism was not reliable, and therefore a charged cartridge should never be in line with barrel); Hercules Powder Co. v. Hicks, 453 S.W.2d 583 (Ky.1970) (danger in carelessly handling dynamite obvious); and, Jones v. Hutchison Manufacturing, Inc., 502 S.W.2d 66 (Ky.1973) (danger in playing near an operating corn auger, where metal blades whirred at high speeds unprotected by any guard that would prevent limbs from contacting the blades "so apparent that as a matter of law it was unreasonable to fix liability on the manufacturer for the injury"). In each case listed, there was no question but that the danger was inherent in the product and well known to any potential purchaser.[1]
 
 
 17
 We infer from these guidelines that the Kentucky Supreme Court means that courts should examine the facts of each case before it, and then declare a product not to be "unreasonably dangerous" as a matter of law only if the facts show a type of obvious and unavoidable danger similar to that posed in one of the listed cases. We affirm the district court on plaintiffs' strict liability claim because this case involves just that sort of obvious and unavoidable danger.
 
 
 18
 The dangers of disposable butane lighters are both obvious and unavoidable. The very purpose of a lighter is to create a flame. That flame may be kept burning for as long as a person applies the proper pressure on the lighter. Any disposable butane lighter of any design necessarily must possess these characteristics, much as any sort of dynamite must possess explosive capability.
 
 
 19
 Hatfield's deposition testimony leaves no doubt that the adults watching Sammy Lee were well aware of these dangers. They had all used lighters before. They had seen that Sammy Lee could both ignite a flame with the lighter and keep that flame lit for an extended period of time. In fact, Hatfield had removed a lighter from Sammy Lee when she caught him using the flame to illuminate the space under Tomblin's couch. They all knew that lighters should be kept away from children because children could start fires with the lighters. Plaintiffs have testified in their depositions that they too are aware that lighters produce flames, and that children can start fires with them. The dangers of butane lighters were clearly well known to all parties involved.
 
 
 20
 We believe this case is factually indistinguishable from Jones. In Jones, the plaintiff was the father of a five-year old girl who had lost her left foot in an accident. The plaintiff was a farmer who was unloading corn into a corn auger type of grain elevator. He brought the five-year old along with him to unload a truck full of corn into the auger. He let his five-year old ride on the load of corn in the truck and told her to get down from the truck when he stopped. He did not see her get down, but he then left the truck, started the machinery, returned to the truck cab and told his assistant to raise the front end of the truck to permit the corn to run out of a trap door in the rear of the truck into the auger. When almost all of the corn had run out of the truck, the assistant went back to shovel the remaining corn into the auger. He then found the girl holding on to a chain in the truck bed that connected the two sides of the bed. The girl let go of the chain and slid through the door into the auger. The auger ripped off her left foot and part of her left leg before the father could remove her. The plaintiff appealed entry of summary judgment in favor of the defendant.
 
 
 21
 The court in Jones held that the design of the auger was not unreasonably dangerous, and that the accident was caused by the father's negligence. All augers had the same sort of design, and were guarded by three one-half-inch iron rods running lengthwise and spaced three and one-fourth inches apart. The court noted the entire industry would be liable if this design were found unreasonably dangerous, and that it was common knowledge that injuries to the hand and foot could occur when using the auger.
 
 
 22
 The similarity to Jones is obvious. It is common knowledge that children can cause fires with lighters. All lighters on the market at the time of the blaze had similar designs, and none of them had any child-proofing devices. As in Jones, the child was under the care of an adult who knew the dangers inherent in the activity, but failed to take the steps necessary to insure that the child would not be hurt. Thus, as the auger in Jones was held not to be unreasonably dangerous, so too should the lighter here be held not to be unreasonably dangerous.
 
 B
 
 23
 We turn now to plaintiffs' negligence claim. The elements of a prima facie negligence claim are well known: duty, breach, causation, and damages. Mapother and Mapother, P.S.C. v. Douglas, 750 S.W.2d 430, 431 (Ky.), cert. denied, 488 U.S. 854 (1988), citing Prosser and Keeton, The Law of Torts, 163, 168 (5th ed. 1984). While we believe that the district court erred in ruling that Scripto-Tokai had no duty to protect children such as Sammy Lee from the potential ill effects of its lighters, see Grayson Fraternal Order of Eagles, Aerie No. 3738, Inc. v. Claywell, 736 S.W.2d 328, 332 (Ky.1987) ("every person owes a duty to every other person to exercise ordinary care in his activities to prevent foreseeable injury"); Wemyss v. Coleman, 729 S.W.2d 174, 180 (Ky.1987), we nevertheless affirm the court's grant of summary judgment for defendants because Kentucky courts would find as a matter of law that Scripto-Tokai's failure to childproof its lighters would not constitute a breach of that duty.
 
 
 24
 We do not delve deeply into this issue because neither the parties nor the district court did. Both parties seemed to assume that resolution of the strict liability issue would resolve the other two claims because plaintiffs could not recover for the remaining claims unless the court found that defendant owed plaintiffs a duty to childproof its lighter. In light of the very broad statements that Kentucky has made regarding the scope of that duty, we cannot hold that there was no issue of material fact regarding whether such a duty exists.
 
 
 25
 However, the arguments advanced by both sides really were not directed at proving that no duty toward Sammy Lee and the adult plaintiffs existed. Rather, the arguments were directed to the proposition that Scripto-Tokai's failure to childproof its lighters was not an unreasonable decision. This question is examined in Kentucky negligence law under the rubric of breach, not duty. As the cases cited above show, defendants owe a duty to all to use ordinary care in their activities. What constitutes "ordinary care" requires a court to determine what "the ordinarily prudent person acting under similar circumstances" would have done, Harris v. Thompson, 497 S.W.2d 422 (Ky.App.1973), regardless of whether the precise injury caused was foreseeably by that person or not. Bolus v. Martin L. Adams & Son, 438 S.W.2d 79 (Ky.App.1969). Thus, we examine whether Scripto-Tokai's decision not to childproof its lighters was what an ordinarily prudent manufacturer would have done faced with the knowledge that children such as Sammy Lee could operate the lighter without adult supervision.
 
 
 26
 While "ordinarily the question of negligence ... is one for a jury to determine," Darnell v. Hamilton, 358 S.W.2d 361, 362 (Ky.App.1962), "[t]he general rule is that ... the determination of the degree of care is one for the court." New St. Louis & Calhoun Packet Corp. v. Pennsylvania Railroad Co., 194 S.W.2d 977, 982 (Ky.App.1946). "[T]he care which the actor is required to exercise to avoid being negligent ... is that which he, as a reasonable man, should recognize as necessary to prevent the act from creating an unreasonable risk of harm to another." Mackey v. Spradlin, 397 S.W.2d 33, 37 (Ky.App.1965), quoting Restatement (Second) of Torts, § 298 (emphasis added). We believe that failure to childproof disposable butane cigarette lighters does not create an unreasonable risk of harm to children in Sammy Lee's situation. An accident can happen to a child like Sammy Lee only through the combination of many factors; inadequate adult supervision, the availability of lighters, and the child using the lighter to burn something rather than simply as a light. There is a risk that these factors will coincide, as this case tragically demonstrates, but it is not high. As Kentucky has established that "[o]ne is not required to use the 'safest' equipment, so long as what is furnished is 'safe'," Clements v. Ashland Oil, Inc., 657 S.W.2d 223, 225 (Ky.1983), we believe the very low probability of a harm coming to children from Scripto-Tokai's lighters establishes the risk of harm as sufficiently reasonable to absolve Scripto-Tokai of liability.
 
 
 27
 Were we to hold otherwise, the principle that we would have to adopt would permit virtually every manufacturer of a household tool or appliance to be found negligent. Knives, guns, blenders, saws, drills: the list of helpful tools perfectly safe in adult hands but dangerous in the hands of unsupervised children is endless. In all of these cases, the utility of the tool is high and the probability of harm is virtually nil when a child is properly supervised. Even here, had the adults not been drinking, had they not carelessly left lighters hanging around the house even though they knew that Sammy Lee could operate a lighter and use it as a toy, the accident would never have happened. When the risk of harm is so low, and requires misbehavior on the part of supervising adults to cause it to occur, we cannot hold that a manufacturer has acted unreasonably.
 
 C
 
 28
 We also affirm the district court's grant of summary judgment regarding plaintiffs' breach of implied warranty claim. This claim arises under KRS § 355.2-314, which reads as follows:
 
 
 29
 (1) Unless excluded or modified (KRS 355.2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....
 
 
 30
 (2) Goods to be merchantable must be at least such as ...
 
 
 31
 (c) are fit for the ordinary purposes for which such goods are used.
 
 
 32
 We affirm the district court because we can find no Kentucky cases, and plaintiffs have cited none to us, that hold that KRS 355.2-314 applies to a case of design defect unrelated to a malfunction of the product itself.
 
 
 33
 The statute only provides that manufacturers warranty goods to be fit for ordinary purposes. This has been applied sparingly in reported Kentucky cases, and always where the product itself failed to perform the simple task that it was manufactured for. See Falcoln Coal Co. v. Clark Equipment Co., 802 S.W.2d 947 (Ky.App.1990) (statute can apply where front-end loader catches fire); Riffe v. Black, 548 S.W.2d 175 (Ky.App.1977) (statute applies to poorly-installed pool lining causing hole in pool bottom); Belcher v. Hamilton, 475 S.W.2d 483 (Ky.App.1972) (statute applies to malfunction of frozen food case that spoils food). Plaintiffs' claim depends on the fact that Scripto-Tokai's lighter was fit for its ordinary purpose, to create a flame. Plaintiffs implicitly ask that we extend the meaning of "ordinary use" to encompass extraordinary but foreseeable misuses. We see no indication that Kentucky would so hold, and as a court sitting in diversity we are bound by this observation.
 
 III
 
 34
 For the foregoing reasons, we AFFIRM the district court in all respects.
 
 
 
 *
 The Honorable Robert B. Krupansky became a Senior Circuit Judge on July 1, 1991
 
 
 **
 The Honorable Patrick J. Duggan, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 We believe that this is consistent with the court's rejection in Nichols of a "patent danger" or "consumer expectation" defense to design defect suits. Nichols, 602 S.W.2d at 432. The court in Nichols specifically rejected as unduly restrictive a jury instruction stating that a product was unreasonably dangerous when: "The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Ibid. The court rejected this instruction, in part because: "In many situations, particularly involving design matters, the consumer would not know what to expect, because he would have no idea how safe the product could be made." Ibid., quoting Wade, On the Nature of Strict Liability for Products, 44 Miss.L.J. 825, 829 (1973). In this case, the very nature of a lighter--much like a gun or a knife--invites contemplation of the real possibility of danger regardless of its design. The cases listed are consistent with this observation, as they all involved inherently dangerous items--guns, dynamite, and fast-moving metal blades. While it could be argued that a disposable butane lighter could be fitted with a childproof cap, or require more pressure to ignite the flame, similar claims could be made regarding a gun or the corn auger in Jones. The Kentucky Supreme Court has seen no inconsistency between Nichols and Montgomery Elevator, and we will not be the first to intimate that one exists